UNITED STATES DISTRICT COURT
DISTRICT OF IDAHO

| | |
|---|---|
| ROCKY D. STONE,<br><br>    Plaintiff,<br><br>vs.<br><br>LORIN NIELSEN, Bannock County Sheriff; CAPTAIN TAD BYBEE; SGT. FRENCH; SGT. MICHELSON; CAPTAIN TOPLIFF; J.T. HAPKE; J.T. FONNESBECK; RYAN WEST, United States Marshal,<br><br>    Defendants. | Case No.: 4:16-cv-00095-REB<br><br>MEMORANDUM DECISION AND ORDER RE: DEFENDANTS' MOTION FOR SUMMARY JUDGMENT<br><br>(Docket No. 20) |

Now pending before the Court is Defendants' (French, Topliff, Hapke, and Fonnesbeck) Motion for Summary Judgment (Docket No. 20). Having carefully considered the record, participated in oral argument, and otherwise being fully advised, the Court enters the following Memorandum Decision and Order:

## I. BACKGROUND

Plaintiff Rocky Stone is an inmate in the custody of Madison County, currently incarcerated in the Madison County Jail in Rexburg, Idaho. This case involves an incident that took place on January 9, 2016 while Plaintiff was incarcerated at the Bannock County Jail in Pocatello, Idaho. The relevant facts are as follows:[1]

    1.    After pleading guilty to possession of methamphetamine with intent to deliver, Plaintiff was originally incarcerated in the Mini-Cassia County Jail. *See* Defs.' SOF, p. 2

---

[1] On May 3, 2016, the Court entered its Initial Review, allowing Plaintiff to proceed in this matter on his state law negligence claims and Eighth Amendment failure-to-protect claims against Defendants French, Hapke, Topliff, and Fonnesbeck. *See* 5/3/16 Order (Docket No. 8). Plaintiff was not allowed to pursue any claims against any of the other Defendants. *See id*.

**MEMORANDUM DECISION AND ORDER - 1**

(Docket No. 20, Att. 2). While there, Plaintiff notified officers that he had been labeled as a cooperating witness against an inmate in the Bannock County Jail (Christopher Keeling), and that he would have a "housing issue" if transferred to Bannock County Jail. *See* Stone Dep., 49:19-24, Attached as Ex. A to Hall Aff. (Docket No. 20, Att. 5).

    2. On January 8, 2016, Plaintiff was transferred to Bannock County Jail. *See id*. at 53:6-10. During the booking process, Plaintiff underwent two different evaluations – (1) an Initial Inmate Evaluation at approximately 5:58 p.m. and (2) a Risk Assessment Evaluation at 1:16 a.m. *See* Topliff Aff., ¶¶ 3-4 (Docket No. 20, Att. 3).

    a. As part of the Initial Inmate Evaluation, Plaintiff was asked whether he had any enemies at the Bannock County Jail; Plaintiff answered "no." *See id*. at ¶ 3 (citing Ex. A. to Topliff Aff. (Docket No. 20, Att. 3) ("**Question:** Do you have any enemies in this facility? **Answer:** No")). With respect to his communication with Defendant Hapke (identified by Plaintiff as a "Jail Tech"), Plaintiff testified:

> She – Hapke booked me into the jail, did my booking questionnaire. She asked me if I had any known enemies or any family in the facility. I told them, I said: I don't have any known enemies that I know about. I don't know who is here. I said: But you need to be aware that there's going to be a housing issue wherever you guys house me in this jail due to the fact that – the circumstances involving my case that I'm labeled a snitch.

Stone Dep., 56:12-17, attached as Ex. A to Hall Aff. (Docket No. 20, Att. 5). Defendant Hapke responded that she would document Plaintiff's concerns. *See id*. at 56:23-25.

    b. As part of the Risk Assessment Evaluation, Plaintiff was asked whether there was anyone in the facility that he did not get along with; Plaintiff answered "yes," that he did not get along with Christopher Keeling. *See id*. at ¶ 4 (citing Ex. B to Topliff Aff. (Docket No. 20, Att. 3) ("**Question:** Is there anyone in this facility that you do not get along with? **Answer:** Yes (add comments below) **Notes:** keeling, christopher")); *but see* Stone Dep., 56:18-

**MEMORANDUM DECISION AND ORDER - 2**

22, attached as Ex. A to Hall Aff. (Docket No. 20, Att. 5) (Plaintiff testifying that, when booked, he did not know whether Christopher Keeling was housed at Bannock County Jail).

    3.     After being booked into the Bannock County Jail and while being confined in a holding cell, Plaintiff mentioned to Defendant Fonnesbeck (identified by Plaintiff as a "Jail Tech") that he may have a "housing issue," testifying:

> Next one was Jail Tech Fonnesbeck. He was doing a walk – in Bannock County they have little things on the doors where they have to walk and do security checks. He was doing his security check. An inmate that was in the cell with me had asked me if I had made any of the officers aware of me being housed around Keeling.
>
> And I told him, I said: Yeah, I made Hapke aware of it. He said: Well, make sure you make Fonnesbeck aware of it too so he can make sure it's documented. So I told Fonnesbeck about it. I told him that there was going to be a housing issue for me there. He said that he would make sure that it was documented.

Stone Dep., 57:4-18, attached as Ex. A to Hall Aff. (Docket No. 20, Aff. 5). Defendant Fonnesbeck responded that he would ensure that Plaintiff's concerns were documented. *See id*. at 58:13-15.

    4.     Approximately an hour later, Plaintiff also notified Defendant Topliff (identified by Plaintiff as a "Corporal") of his potential "housing issue," testifying:

> [Defendant Topliff] was walking me to visiting to go schedule a visit and to check my messages on the kiosk. Down there they have a kiosk. People message you. On the way down there I made him aware of the situation. And he's always been an officer that I've always been able to talk to there in that county. . . . . He's somebody that I've been able to – like he's light-mooded. You know, I've been able to talk to him. I've always been on a good basis with him. . . . . He took me to visiting. On the way to visiting that day, I made him aware of the situation. . . . On our way to visiting when we were walking through – out the booking door into the hallway, I told him – I made him aware of this situation . . . [w]ith me and Keeling and told him that it's a huge issue for me to be housed around any of that – anything that has to do with that sort of politics . . . [such as] [b]eing labeled a rat, being labeled a witness. I informed him that there was going to be issues with me to be housed in that jail. And he was the third person that I made aware of it. On the way into visiting he asked me if I had made Hapke aware of it. I told him that I had. He said that he would speak to her.

*Id*. at 58:20-60:15.

**MEMORANDUM DECISION AND ORDER - 3**

5. Plaintiff then spoke to Defendant French (identified by Plaintiff as a "Sergeant") when she retrieved him from his holding cell to watch an orientation video, testifying:

> Sergeant French pulled me into – she pulled me out of the cell and had me go into this little orientation room where they do – they make you watch a procedural video. And while I was sitting in that room I told her about the issue that I would have being housed in that jail and that I had already spoken to Hapke and Fonnesbeck and Topliff about it. And she said that she would make sure that I wasn't housed around any of those guys [Chris Keeling].

*Id*. at 60:25-61:14. Defendant French indicated to Plaintiff that he would not be housed around Mr. Keeling. *See id*. at 61:15-17.

6. It is standard procedure for the Bannock County Jail to place inmates being held by the U.S. Marshalls on federal charges in the C-Pod cell block because it has the highest security; C-Pod contains four different units – Medium, Maximum, Disciplinary, and Special. *See* Topliff Aff., ¶¶ 5-6 (Docket No. 20, Att. 3). In the absence of additional concerns, inmates are placed in whichever unit has available bed space. *See id*. at ¶ 6.

7. Early on January 9, 2016, Plaintiff was moved to a cell in C-Pod Medium, a unit that is separated from inmates in other cell blocks and units. *See id.* at ¶ 7; *see also* Stone Dep., 62:2-9, 64:21-25, 65:1-6 attached as Exs. A & B to Hall Aff. (Docket No. 20, Atts. 5 & 6). Plaintiff was not placed in the same unit in which Mr. Keeling was housed. *See* Topliff Aff., ¶ 8 (Docket No. 20, Att. 3).

8. Later that morning, Plaintiff was attacked by three inmates, describing the incident as follows:

> January 9th they moved me from booking to C pod and put me – housed me in medium pod. when I went into medium pod it was early in the morning. Then that was – it was the day of laundry. And that morning I seen people coming by my door and my cellie had got up to have the door open so he could get his laundry. And I had heard another inmate going around telling other inmates that I was on that tier. And as I got off my bunk . . . .

**MEMORANDUM DECISION AND ORDER - 4**

> Yeah. the doors had popped for people to grab their laundry. And when I heard my door pop, I jumped off my bed, jumped down, and three inmates approached my cell. Jonathan Brewer approached the cell and told me that I needed to push a button and leave. And as he was telling me that, he punched me in the face.
>
> I curled up to try to protect myself and the other two inmates, Cox and McKinney, came in, continued assaulting me, punching me in the head. All I could do was just try to cover up and go down. The last thing that I remember was seeing Cox punching me from up here. And then I got kicked in the face and my head got bounced against the wall and I got knocked out, knocked unconscious.
>
> When Jeremiah came in – when Brewer came in the cell, he told me that I needed to push a button, that I was a rat, that I couldn't stay on the tier.

Stone Dep., 62:7-15, 66:1-19, attached as Exs. A & B to Hall Aff. (Docket No. 20, Atts. 5 & 6). After the three inmates left his cell, Plaintiff called for assistance from jail officials. *See id*. at 66:20-22, attached as Ex. B to Hall Aff. (Docket No. 20, Att. 5).

9. Plaintiff was then taken to booking and spoke with Defendant French about what had happened, explaining that he did not know the inmates who had attacked him. *See id*. at 71:18-22 ("And I told her, I said: Well, I got assaulted just like I told you guys was going to happen. And she's like: Well, who was it? I said: I don't know. At this time I didn't know Brewer, McKinney, or Cox.").

10. Plaintiff received medical treatment and was moved to a different general population cell block (C-Pod – Maximum) where he did not have issues for approximately one month until being transferred to the Madison County Jail. *See id*. at 73:8-13, 77:9-25, 78:1-4, 80:17-25, 93:17-94:1-2.

11. In this case, Plaintiff asserts Eighth Amendment failure-to-protect claims, as well as his state law negligence claims against Defendants French, Hapke, Topliff, and Fonnesbeck. *See supra* (citing 5/3/16 Order (Docket No. 8)). Defendants now move for summary judgment. *See* Mem. in Supp. of MSJ, p. 2 (Docket No. 20, Att. 1) ("Plaintiff has failed to present any genuine issues of material fact to support his claims.").

**MEMORANDUM DECISION AND ORDER - 5**

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[ ] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327. "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). there must be a genuine dispute as to any *material* fact – a fact "that may affect the outcome of the case." *Id*. at 248.

The moving party is entitled to summary judgment if that party shows that each issue of material fact is not or cannot be disputed. To show the material facts are not in dispute, a party may cite to particular materials in the record, or show that the materials cited do not establish the presence of a genuine dispute, or that the adverse party is unable to produce admissible evidence to support the fact. *See* Fed. R. Civ. P. 56(c)(1)(A) & (B); *Ransier v. United States*, 2014 WL 5305852, *2 (D. Idaho 2014).

Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III. DISCUSSION

Plaintiff alleges that Defendants French, Hapke, Topliff, and Fonnesbeck violated his Eighth Amendment rights and that Defendants' conduct was negligent under Idaho state law. Defendants argue that they are entitled to summary judgment in five different respects: (1) Plaintiff's negligence claims should be dismissed because Plaintiff failed to post a bond as required by Idaho Code § 6-610; (2) Plaintiff's negligence claims should alternatively be dismissed because there is no evidence of malice, criminal intent, or recklessness as required by Idaho Code § 6-904A; (3) Defendants did not violate Plaintiff's Eighth Amendment right to be free from cruel and unusual punishment; (4) the injuries from which Plaintiff seeks damages for pain and suffering are *de minimis*; and (5) Defendants are entitled to qualified immunity in any event. *See* Mem. in Supp. of MSJ, pp. 2-19 (Docket No. 20, Att. 1). Each is addressed below.

### A. Idaho Code § 6-610's Bond Requirement

Defendants seek to dismiss Plaintiff's state law negligence claims for failure to post bond under Idaho Code § 6-610. *See* Mem. in Supp. of MSJ, pp. 2-6 (Docket no. 20, Att. 1). Section 6-610 requires that "[b]efore any civil action may be filed against any law enforcement officer or service of civil process on any law enforcement officer," a plaintiff must post a bond prior to or simultaneously with the filing of the complaint. I.C. § 6-610(2); *see also Allied Bail Bonds, Inc. v. Cty. of Kootenai*, 258 P.3d 340, 345 (Idaho 2011). Although not a jurisdictional requirement, posting bond is "mandatory" and a failure to post bond requires the trial court judge to dismiss the claims immediately. I.C. § 6-610(5).

Plaintiff brings state negligence claims against law enforcement officers and he did not post the bond when he filed his Complaint. However, a court may waive costs, fees, and security if (1) the party requesting a waiver files an affidavit stating that he is indigent and unable to pay the costs, fees, and security associated with his case, and (2) the court finds, after informal

inquiry, that the party is indigent for the purpose of prepayment of fees, costs, or security. *See* I.C. § 31-220(2)(a), (b). This statute applies to bonds under Idaho Code § 6-610. *See Thiemann v. Donahue*, 2014 WL 2948996, at *1 (D. Idaho 2014).

Here, Plaintiff was incarcerated at the time he filed his Complaint on March 7, 2016. *See* Compl. (Docket No. 3). Contemporaneously, Plaintiff also requested in forma pauperis status. *See* IFP App. (Docket No. 1). On March 22, 2016, the Court granted Plaintiff's application for in forma pauperis and directed payments for the filing fee to be made from his prison account. *See* 3/22/16 Order, pp. 1-3 (Docket No. 6). In this setting, the Court has effectively waived Idaho Code § 6-610's bond requirement, such that Plaintiff's failure to post a bond does not mandate dismissal of his state law negligence claims against Defendants. *See Kangas v. Wright*, 2016 WL 6573943, at *6-7 (D. Idaho 2016) (citing *Pauls v. Green*, 816 F. Supp. 2d 961, 977 (D. Idaho 2011)). Defendants' Motion for Summary Judgment is therefore denied in this respect.

**B.     Idaho Code § 6-904A's Exceptions to Government Liability**

Defendants only can be liable for negligence claims under the Idaho Tort Claims Act ("ITCA") if they were acting with malice or criminal intent, or if their conduct was reckless, willful, and wanton. *See* I.C. § 6-904A(2); *Mareci v. Coeur d'Alene School Dist. No 271*, 250 P.3d 791, 795 (Idaho 2011). There is no allegation or evidence of malice or criminal intent here. For purposes of the ITCA, "'reckless, willful and wanton conduct' is present only when a person intentionally and knowingly does or fails to do an act creating unreasonable risk of harm to another, and which involves a high degree of probability that such harm will result." I.C. § 6-904C(2). The applicable test for "reckless, willful and wanton conduct" is whether the person "intentionally does or fails to do an act, knowing or having a reason to know facts that would lead a reasonable man to realize that his conduct not only creates unreasonable risk of harm to another, but involves a high degree of probability that such harm would result.'" *Harris v. State*,

**MEMORANDUM DECISION AND ORDER - 8**

*Dept. of Health and Welfare*, 847 P.2d 1156, 1160 (Idaho 1992). "[T]he key element of this definition is the type of knowledge that implies an element of foreseeability. Under this standard, the type of harm incurred must be manifest or ostensible, and highly likely to occur." *Farnworth v. Ratliff*, 999 P.2d 892, 894 (Idaho 2000). Foreseeability "contemplates more than the mere possibility of aggressive tendencies harbored by the state's ward." *Harris*, 847 P.2d at 1160. Against this standard, Plaintiff's state law negligence claims cannot stand.

Before being attacked on January 9, 2016, Plaintiff said that he did not get along with Christopher Keeling and generally stated that he would have a "housing issue" being placed anywhere in the Bannock County Jail. However, he did not identify any known enemies. *See supra*. The record is undisputed that, in response, Plaintiff's concerns were documented and he was not housed near Mr. Keeling. *See id*. That Plaintiff was soon thereafter attacked by three inmates *whom he did not know* is unquestionably unfortunate, but this fact alone cannot establish that Defendants engaged in a course of conduct which created an unreasonable risk of harm to Plaintiff and which involved a high degree of probability that such harm would result.[2]

At most, Plaintiff has asserted standard negligence claims against Defendants. The record does not, however, sufficiently support a finding that Defendants engaged in the reckless, willful, or wanton conduct needed to sustain such claims under the circumstances presented here. Accordingly, Defendants are entitled to immunity on Plaintiff's negligence claims pursuant to Idaho Code § 6-904A. Defendants' Motion for Summary Judgment is granted in this respect.

**C.  Eighth Amendment Right to be Free from Cruel and Unusual Punishment**

The Eighth Amendment's proscription against cruel and unusual punishment requires prison officials to protect inmates from violent attacks by other inmates. *see Farmer v. Brennan*,

---

[2] Additionally, it is undisputed that, immediately after the attack, Defendants made sure that Plaintiff received any necessary medical treatment. *See supra*.

**MEMORANDUM DECISION AND ORDER - 9**

511 U.S. 825, 833 (1994). But not every injury "suffered by one prisoner at the hands of another . . . translates into constitutional liability for prison officials responsible for the victim's safety." *Id.* at 834. To establish a failure-to-protect claim, "the inmate must show that he is incarcerated under conditions posing a substantial risk of serious harm" and that the prison official acted with "deliberate indifference" to the inmate's health or safety. *Id*. A prison official acts with deliberate indifference if he "knows of and disregards an excessive risk to inmate health or safety" – that is, "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id*. at 837. A prisoner alleging an Eighth Amendment violation need not show that prison officials believed that harm would actually occur; "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm." *Id*. at 842. A prison official's knowledge of the risk "can be proven through circumstantial evidence, such as by showing that the risk was so obvious that the official must have known about it." *Johnson v. Johnson*, 385 F.3d 503, 524 (5th Cir. 2004). A prison official, however, may avoid liability if he "responded reasonably to the risk, even if the harm ultimately was not averted." *Farmer*, 511 U.S. at 844. Further, the mere negligent failure to protect a prisoner from assault does not comprise a constitutional violation. *See Davidson v. Cannon*, 474 U.S. 344, 347-48 (1986).

Even when assuming that Plaintiff objectively faced a substantial risk of serious harm at some point in between being booked at the Bannock County Jail and his assault hours later, there is no evidence in the record that the Defendants (either individually or collectively) had an understanding of that risk, and knowingly and unreasonably disregarded that risk during that same space of time. *See Gibson v. County of Washoe, Nev.*, 290 F.3d 1175, 1188 (9th Cir. 2002) ("If a [prison official] should have been aware of the risk, but was not, then the [prison official] has not violated the Eighth Amendment, no matter how severe the risk."). To the contrary, when

made aware of an actual, known risk involving Christopher Keeling, Defendants responded appropriately by placing Plaintiff in a different cell block than that in which Mr. Keeling was housed. *See supra*. Plaintiff's vague and undefined complaints about a potential "housing issue" (beyond his concerns about Mr. Keeling) were too vague and generalized to have put any of the Defendants on notice of an obvious and imminent threat to Plaintiff's safety, especially when Plaintiff said during the jail booking process that he had no known enemies at the Bannock County Jail (other than, possibly, Christopher Keeling). *See id*.

To be clear, proving deliberate indifference in this setting requires *more* than a showing of negligence. Plaintiff must establish (or, at this stage of the litigation, raise a genuine dispute of material fact) that Defendants failed to take measures to prevent the January 9, 2016 assault, despite knowing of a substantial risk that Plaintiff would be assaulted. As a matter of law on this lynchpin issue, there is no evidence to support an assertion that Defendants were *deliberately* indifferent to Plaintiff's health or safety. *See Hayes v. Corrections Corp. of America*, 2012 WL 4481212, *9 (D. Idaho 2012) ("Prison officials might avoid a finding of deliberate indifference if they show, for example, 'that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent.'") (citing *Magnan v. Runnels*, 2010 WL 3768148, *4 (E.D. Cal. 2010) (quoting *Farmer*, 511 U.S. at 844)). Therefore, Plaintiff's Eighth Amendment failure to protect claim must fail. Defendants' Motion for Summary Judgment is granted in this respect.

D.  **Defendants' Contention that Plaintiff's Injuries Are** *De Minimis*

Defendants contend that Plaintiff should be precluded from seeking damages for pain and suffering where the injuries he sustained were *de minimis*. *See* Mem. in Supp. of MSJ, p. 14 (Docket No. 20, Att. 1) (citing *Hayes*, 2012 WL 4481212 at *19 (citing 42 U.S.C. § 1997e(e))).

In support of this position, Defendants argue that Plaintiff suffered only a cut on the inside of his lip and on the bridge of his nose, goose bumps on his head, and puffy eyes; that photographs taken of Plaintiff demonstrate that his injuries were minor; that Plaintiff's eyes never turned black; that the nurse cleaned Plaintiff's cuts and indicated he did not need any stitches; and that Plaintiff's injuries healed within a few days to a week. *See id*. at pp. 14-15.

This argument is too simplistic, in that it highlights only the superficial injuries capable of being depicted in photographs and easily treated by a first aid kit. Plaintiff, however, has testified to a potentially more significant injury – namely, traumatic brain injury (concussion) – that exists independent of visible cuts and bruises:

> And every time, like, when I would cover up like this, these guys would hit me on this side, Sean would hit me on this side. and, like I said, I don't remember who kicked me. I was on the ground like kneeling – I was on my feet kneeling in the corner like this. And I got kicked right here in the side of the face. My head bounced off the wall and was knocked unconscious.

Stone Dep., 70:12-19, attached as Ex. A to Hall Aff. (Docket No. 20, Att. 6); *see also id*. at 95:1-96:22 (discussing potential post-traumatic stress disorder associated with January 9, 2016 assault). In other words, the extent of Plaintiff's injuries are necessarily unknown and, thus, it cannot be said as a matter of law that Plaintiff's injuries were *de minimis*. Defendants' Motion for Summary Judgment is therefore denied in this respect.

E.  **Qualified Immunity**

Qualified immunity shields government officials performing discretionary functions from civil liability if their actions were objectively reasonable in light of clearly established law at the time they acted. *See Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The Supreme Court has laid out a two-pronged inquiry for determining whether a public official enjoys qualified immunity: (1) the trial court examines the facts alleged in the light most favorable to the plaintiff and determines whether the officer's alleged conduct violated a constitutional right, and

**MEMORANDUM DECISION AND ORDER - 12**

(2) the court decides whether that right was clearly established at the time of the alleged violation. *See Saucier v. Katz*, 533 U.S. 194, 201 (2001). The court may exercise its discretion as to which prong to address first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 553 U.S. at 202; *see also Anderson v. Creighton*, 483 U.S. 635, 640 (1987) ("The contours of the right must be sufficiently clear that a reasonable official would understand" that his conduct violates that right). On the other hand, if an official's alleged conduct violated a clearly established right of which a reasonable officer would have known, he is not entitled to qualified immunity. *See id*.

Applying this standard (and assuming Plaintiff had a viable Eighth Amendment claim (*but see supra*)), the law is not sufficiently clear that Defendants would have known that the Plaintiff's Eighth Amendment right against cruel and unusual punishment had been violated by their conduct. When Plaintiff was booked into the Bannock County Jail, he simply stated to Defendants that he was going to have a "housing issue" being placed anywhere in the jail, even though he had no known enemies (other than, possibly, Christopher Keeling). If there was a threat involved with that statement, it certainly was inchoate and not reasonably identifiable for the jail staff. Even so, Defendants said they would document Plaintiff's concerns, and they purposely housed Plaintiff in a different cell block, away from Mr. Keeling. Without more, these facts do not reflect a situation in which a reasonable officer – like each of the Defendants – would have understood that what they actually did by way of addressing Plaintiff's concerns was unconstitutional. In short, the law did not (and would not have) put the Defendants on notice that their conduct would be clearly unlawful. In this setting, Defendants are entitled to qualified immunity. Defendants' Motion for Summary Judgment is granted in this respect.

**MEMORANDUM DECISION AND ORDER - 13**

## IV. ORDER

Based on the foregoing, IT IS HEREBY ORDERED that Defendants Motion for Summary Judgment (Docket No. 20) is GRANTED, in part, and DENIED, in part, as follows:

1. Plaintiff's failure to post a bond pursuant to Idaho Code § 6-610 does not mandate dismissal of his state law negligence claims against Defendants. In this respect, Defendants' Motion for Summary Judgment is DENIED.

2. Defendants are entitled to immunity on Plaintiff's negligence claims pursuant to Idaho Code § 6-904A. In this respect, Defendants' Motion for Summary Judgment is GRANTED.

3. Plaintiff's Eighth Amendment failure to protect claim is without merit. In this respect, Defendants' Motion for Summary Judgment is GRANTED.

4. Questions of fact preclude finding Plaintiff's injuries to be *de minimis* as a matter of law. In this respect, Defendants' Motion for Summary Judgment is DENIED.

5. Defendants are entitled to qualified immunity with respect to their conduct giving rise to Plaintiff's claims. In this respect, Defendants' Motion for Summary Judgment is GRANTED.

The practical effect of these findings is that each of Plaintiff's claims against Defendants is dismissed. The Clerk of the Court is directed to the close the case.

DATED: March 27, 2018

_____
Ronald E. Bush
Chief U.S. Magistrate Judge